**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARIA PULIDO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No. 13 C 0164 |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Maria Pulido seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416, 423(d), 1381a. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. After careful review of the record, the Court denies the Commissioner's motion, grants Plaintiff's motion, and remands this case for further proceedings.

## BACKGROUND

Plaintiff was born on July 29, 1967, and was 43 years old at the time of the hearing in this matter. (R. 46; 185). Plaintiff lives with her husband, who works full-time at Wal-Mart, and her twelve-year-old son. (R. 56). She earned a GED in Mexico, but could speak very little English at the time of the hearing, and could not read or write in English. (R. 52, 57, 68, 86). She was taking English as a Second Language ("ESL")

---

1 Ms. Colvin became Acting Commissioner of Social Security on February 14, 2013, and is substituted in as Defendant pursuant to Federal Rule of Civil Procedure 25(d)(1).

classes at a nearby church for about six months prior to the hearing, but had missed some sessions due to feeling too badly to attend.  (R. 78-79).

Plaintiff worked several jobs over the years, including as a cook in fast-food restaurants, and had been working most recently as a store laborer in Wal-Mart since 2006.  (R. 85; 286-87).  Plaintiff injured her back in work-related accidents in January and April 2009, which she treated with Vicodin, physical therapy, and lumbar epidural steroid injections.  (R. 327; 387; 402-12; 583).  Although a physician released Plaintiff for full-duty work without restrictions in July 2009, she claimed she was still unable to perform her job duties due to back pain, and was let go from her Wal-Mart job on October 10, 2009.  (R. 58-59; 284; 437-38).  Prior to being fired, she sometimes worked for a few hours as a greeter at Wal-Mart, and was able to speak enough English to direct customers to the store's departments.  (R. 66-71).

Plaintiff filed her initial applications for DIB and SSI on October 8, 2009, alleging that her disability began on October 7, 2009.  (R. 178-84; 185-88).  After the Social Security Administration ("SSA") denied Plaintiff's claims initially on December 4, 2009, and upon reconsideration on March 10, 2010, Administrative Law Judge ("ALJ") Kim S. Nagle held an April 20, 2011 video hearing.  (R. 96-97; 98-99; 46-95).  Plaintiff, who appeared with counsel, testified at the hearing with the aid of a Spanish-language interpreter.  (R. 46-49).  Randall L. Harding, a vocational expert ("VE"), also testified. (R. 84-91).

In the ALJ's subsequent June 15, 2011 decision, she wrote that Plaintiff suffered from the following severe impairments:  degenerative disc disease of the lumbar spine,

and radiculopathy.[2]    (R. 25).   The ALJ also found that Plaintiff was not able to communicate in English, and was considered the same as an individual who is illiterate in English.  (R. 32).   Based on the record, the ALJ determined that Plaintiff was capable of sedentary work, except that she could only occasionally climb ramps and stairs, only occasionally stoop or crouch, and should never climb ladders, ropes or scaffolds.  (R. 26).   The ALJ also stated that Plaintiff should be allowed a sit-stand option at will, provided that in alternating positions she is off-task for no more than ten percent of the time.  (*Id.*).   Finally, the ALJ found that Plaintiff was limited to occupations which do not require knowledge of the English language.  (*Id.*).   Relying on the VE's testimony, the ALJ determined that Plaintiff was unable to perform any of her past relevant work, but she was not disabled because there were jobs that existed in significant numbers in the national economy that she could perform.  (R. 32-33).   Specifically, the ALJ found Plaintiff could perform the representative occupations of optical lens assembler (DOT 713.687-018), with 150 such jobs in the regional economy and 14,000 such jobs in the national economy; optical polisher (DOT 713.684-038), with 200 such jobs in the regional economy and 14,000 such jobs in the national economy; and lens gauger (DOT 716.687-030), with 150 such jobs in the regional economy and 8,000 such jobs in the national economy.  (R. 33).   On July 19, 2011, Plaintiff requested review of the ALJ's decision, and on September 28, 2012, the appeal was denied.  (R. 4-8; 17-18).

Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.  In support of her motion, Plaintiff argues that the ALJ erred by:  (1) failing to resolve a conflict between the VE's testimony and the Dictionary

---

2    "Radiculopathy" is a disease of the spinal nerve roots.  http://medical-dictionary.thefreedictionary.com/radiculopathy (all websites cited in this opinion were last visited July 22, 2014).

3

of Occupational Titles ("DOT"), compromising the ALJ's reliance on the VE's testimony; (2) failing to attribute controlling weight to the opinions of her treating orthopedic surgeon, Dr. Ryon Hennessy; (3) giving considerable weight to the opinion of an independent medical examiner, Dr. Edward J. Goldberg; and (4) making a flawed credibility assessment.

## DISCUSSION

### A.    Standard of Review

Judicial review of the ALJ's decision, which constitutes the Commissioner's final decision, is authorized by Section 405(g) of the Social Security Act.  *See* 42 U.S.C. § 405(g).  That decision will be upheld "so long as it is supported by 'substantial evidence' and the ALJ built an 'accurate and logical bridge' between the evidence and her conclusion. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (quoting *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009)).  An ALJ need not mention every piece of evidence in her decision, as long as she does not ignore an entire line of evidence that is contrary to her conclusion.  *Id.*  (citing *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)).  Although the Court will not reweigh the evidence or substitute its judgment for that of the ALJ, a decision that "lacks adequate discussion of the issues will be remanded."  *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014); *see also id.* (the ALJ's articulated reasoning must be sufficient to allow the reviewing court to assess the validity of the agency's findings and afford a claimant meaningful judicial review).

### B.    Five-Step Inquiry

To qualify for SSI under Title XVI of the Social Security Act, or DIB under Title II of the Social Security Act, a claimant must establish that she suffers from a "disability"

as defined by the Act and regulations.  *Infusino v. Colvin,* 12 CV 3852, 2014 WL 266205, at *7 (N.D. Ill. Jan. 23, 2014); *Gravina v. Astrue*, 10-CV-6753, 2012 WL 3006470, at *3 (N.D. Ill. July 23, 2012).  A person is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423 (d)(1)(A), 1382c(a)(3); *see also Infusino,* 2014 WL 266205, at *7; *Gravina*, 2012 WL 3006470, at *3.

In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?  (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Simila*, 573 F.3d at 512-13 (citing *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000)).

## C.    The VE Testimony and the DOT

Plaintiff first argues that the ALJ's decision should be reversed because the government did not meet its burden at Step Five.  (Doc. 18, at 10-11).  Specifically, the VE testified that Plaintiff could perform certain representative jobs contained in the DOT, but Plaintiff argues that the DOT's descriptions of the language requirements for those jobs are not consistent with the ALJ's residual functional capacity ("RFC")

determination.[3]  (*Id.*).  Plaintiff argues that the ALJ erred in relying on the VE testimony without resolving the discrepancy between the VE's testimony and the DOT.  (*Id.*)

The claimant bears the burden of proof in each of the first four steps of the disability determination, but the government bears the burden at the fifth step. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011) (citing 42 U.S.C. § 423(d)(2)(A); *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005); *Liskowitz v. Astrue*, 559 F.3d 736, 740 (7th Cir. 2009)).  At Step Five, the government "must present evidence establishing that the claimant possesses the residual functional capacity to perform work that exists in a significant quantity in the national economy." *Id.*  ALJs are required by the social security regulations to take administrative notice of the DOT when determining whether jobs exist in the national economy in a significant quantity that a claimant can perform.  *See id.* (citing 20 C.F.R. § 404.1566(d)(1); 20 C.F.R. 416.966(d)(1)).  ALJs also typically use VEs to "supplement the information provided in the DOT by providing an impartial assessment of the types of occupations in which claimants can work and the availability of positions in such occupations." *Id.* (citing *Liskowitz*, 559 F.3d at 743).  Although the decision whether to employ a VE is within the discretion of the ALJ, once an ALJ decides to rely on VE testimony, she must ensure that the testimony comports with the Commissioner's rulings.  *Id.* (citing *Ehrhart v. Secretary of H.H.S.*, 969 F.2d 534, 540 (7th Cir. 1992)).

Social Security Ruling 00-4p specifically discusses the standards for relying on VE testimony to support a disability determination.  SSR 00-4p, 2000 WL 1898704 (S.S.A. Dec. 4, 2000).  That ruling provides that when there is an "apparent unresolved

---

3    Residual functional capacity is defined as "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a).

conflict" between the VE testimony and the DOT, the ALJ "must elicit a reasonable explanation for the conflict" before relying on the VE testimony. *Id.* at *2. At the hearings level, ALJs must ask the VE, on the record, whether or not there is an inconsistency between the VE's testimony and the DOT. *Id.* If there is a conflict, the ALJ is not necessarily precluded from relying on the VE testimony. *See id.* (the DOT does not "automatically 'trump[ ]'" VE testimony, or vice versa). But the ALJ is required to "resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information." *Id.*

Here, the ALJ found Plaintiff was illiterate and unable to communicate in English, and asked the VE to assume a person who, in addition to certain physical limitations, "would not be able to communicate in English." (R. 26; 32; 86). The VE testified that such a person could perform the requirements of the representative occupations of optical lens assembler (DOT 713.687-018), optical polisher (DOT 713.684-038) and lens gauger (DOT 716.687-030), each of which existed in significant numbers in the regional and national economy. (R. 88-90). The ALJ asked the VE whether his testimony was consistent with the DOT, and the VE testified that it was. (R. 90). In her decision, the ALJ relied on the VE's testimony to conclude that Plaintiff was not disabled. (R. 33).

But, as Plaintiff points out, according to the DOT, each of the three jobs that the VE testified Plaintiff could do requires the ability to read and write in some capacity. The lens gauger job has a "language development level" requirement of "2," in the DOT, which requires, in part, a passive vocabulary of 5,000-6,000 words, and the ability to

read at a rate of 190-215 words per minute, use a dictionary, and write complex sentences with proper punctuation. DOT § 716.687-030, 1991 WL 679466 (G.P.O. Jan. 1, 2008); *see also* DOT Appendix C § III, 1991 WL 688702 (G.P.O. Jan. 1, 2008) (discussing language development level requirements). The optical lens assembler and optical polisher jobs each have a language development level requirement of 1, which requires, among other things, the ability to recognize the meaning of 2,500, two- or three-syllable words, read at a rate of 95-120 words per minute, compare the similarities and differences between words, and write simple sentences. DOT §§ 713.687-018, 1991 WL 679271 (G.P.O. Jan. 1, 2008); 713.684-038, 1991 WL 679267 (G.P.O. Jan. 1, 2008); *see also DOT* Appendix C § III. According to the DOT, if Plaintiff is illiterate in English, she does not have the capacity to perform any of these representative jobs, contrary to the VE's testimony. The ALJ obtained no explanation from the VE regarding this conflict. Hence, this Court is unable to determine whether that the ALJ's reliance on the VE testimony was reasonable despite the conflict.

The Commissioner notes that the ALJ asked the VE during the hearing if his testimony was consistent with the DOT, the VE responded that it was, and yet Plaintiff's counsel failed to point out this literacy-related conflict at that time. (Doc. 33, at 10). Since neither the VE nor Plaintiff raised this issue during the hearing, the Commissioner argues that the ALJ's inquiry alone "satisfied her obligation under Social Security Ruling 00-4p." (*Id.*) In support of this argument, the Commissioner cites *Nicholson v. Astrue*, 341 F. App'x. 248 (7th Cir. 2009).

*Nicholson* is distinguishable from this case. In *Nicholson*, the ALJ found that the claimant was capable of light work. 341 F. App'x. at 254. The VE testified that the

claimant would be capable of performing several representative jobs, including as a janitor and cafeteria worker. *Id.* Both of those jobs, however, required a medium level of exertion, according to the DOT. *Id.* Nevertheless, the Seventh Circuit upheld the ALJ's disability determination because the VE also testified that the claimant could perform certain fast-food jobs that only required a sedentary level of exertion, which met the claimant's RFC. *Id.* Thus, the ALJ's error in failing to obtain an explanation from the VE regarding the janitor and cafeteria worker jobs was harmless. *Id.* In this case, the Commissioner makes no harmless error argument, and doing so would be futile, since each of the jobs the VE testified about require the ability to read and write.

Furthermore, as Plaintiff argues, the failure of her counsel to identify the conflict at the hearing does not prevent her from raising the issue now. *See Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008) ("[A] claimant's failure to raise a possible violation of SSR 00-4p at the administrative level does not forfeit the right to argue later that a violation occurred.") (citing *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006)). Since Plaintiff is raising this issue after the hearing, she must show that the conflict was "obvious enough that the ALJ should have picked up on [it] without any assistance," because Ruling 00-4p only requires the ALJ to investigate and resolve "apparent conflicts" between VE testimony and the DOT. *Id.* (citing SSR 00-4p; *Prochaska*, 454 F.3d at 735).

Plaintiff easily meets her burden since according to the DOT, at least "basic literacy" is "essential for every job in the economy." *See Donahue v. Barnhart*, 279 F.3d 441, 445 (7th Cir. 2002). Nevertheless, the VE testified, without explanation, that Plaintiff could perform some jobs as described in the DOT, even though she was

illiterate. Where a conflict between the VE's testimony and the DOT is obvious, the mere fact that the ALJ asked the VE if his testimony was consistent with the DOT does not satisfy the ALJ's duties under Ruling 00-4p. *Overman*, 546 F.3d at 463 ("[T]he ALJ's affirmative duty extends beyond merely asking the VE whether his testimony is consistent with the DOT; the ALJ also must 'elicit a reasonable explanation for any discrepancy.'") (quoting *Prochaska*, 454 F.3d at 735). The ALJ had a duty to investigate and resolve the conflict here beyond merely asking the VE whether his testimony conflicted with the DOT, which she did not do.

Certainly, not all illiterate claimants are disabled, and a VE may be able to give a reasonable explanation why Plaintiff can perform jobs that exist in significant numbers in the economy despite her illiteracy in English and other limitations. Here, however, the ALJ did not obtain any explanation from the VE. As a result, the ALJ's Step Five finding lacks substantial evidence in support of the ALJ's determination, and this case must be reversed so the ALJ can address this issue.

**D.     Medical Opinion Evidence**

**1.     Dr. Hennessy**

Plaintiff argues that the ALJ also erred by failing to attribute controlling weight to the opinions of her treating orthopedic surgeon, Dr. Hennessy, that Plaintiff could not sustain full-time employment. (Doc. 18, at 11-12). "Under the 'treating physician rule,' a treating physician's opinion that is consistent with the record is generally entitled to 'controlling weight.'" *Schreiber v. Colvin*, 519 F. App'x 951, 958 (7th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2); *Jelinek v. Astrue*, 662 F.3d 805, 911 (7th Cir. 2011)). If the ALJ finds the opinion is not due controlling weight, she must provide "good reasons that

[are] sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Collins v. Astrue*, 324 F. App'x. 516, 520 (7th Cir. 2009) (internal quotations omitted). When determining what weight to give a treating physician's opinion, the regulations instruct ALJs to "consider the length, nature, and extent of the physician-applicant relationship, whether the physician is a specialist in the applicant's condition, the degree of consistency between the opinion and other evidence in the record, and the extent to which the physician supported his opinion with medical findings." *Id.* at 520-21 (citing 20 C.F.R. § 404.1527(d); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008)).

Dr. Hennessy began treating Plaintiff on July 24, 2009, when she sought a second opinion from him regarding her back pain, upon the recommendation of her worker's compensation claim attorney. (R. 65; 330-31). Plaintiff had been injured in work-related accidents in January and April 2009, and had recently been released for full-duty work, without restrictions, by Dr. Ning Jiang, the rehabilitation specialist hired by her worker's compensation insurer. (R. 437-38; 583). After examining Plaintiff, reviewing an MRI of her lumbar spine from January 2009, and being told that she underwent months of physical therapy and several lumbar steroid injections with little improvement in her pain, Dr. Hennessy recommended Plaintiff either learn to live with her pain, or consider surgery. (R. 330-31). Plaintiff chose surgery, and Dr. Hennessy recommended spinal fusion at L4-5 on her lumbar spine, limited her to light duty work of no more than 10 pounds, and recommended a discogram to determine if additional areas of Plaintiff's lumbar spine should be fused. (*Id.*).

Approval from Plaintiff's worker's compensation insurer for the discogram took several months. In the meantime, in September 2009, Plaintiff complained that her job was not complying with Dr. Hennessy's light duty restrictions, and she was experiencing leg weakness from having to walk or stand for two or three hours a day. (R. 334). Dr. Hennessy then limited Plaintiff to working no more than four hours per day, while seated, with lifting requirements of no more than 10 pounds. (R. 334-35). About a month later, Plaintiff was let go from her Wal-Mart job, on October 10, 2009. (R. 58-59; 284; 437-38). In early December 2009, although Dr. Hennessy noted Plaintiff had "essentially the same symptoms," he prescribed her Ultram[4] and Flexeril[5] for pain (in addition to refilling the Vicodin she had been taking). (R. 527). The surgeon also began to write "To Whom It May Concern" letters and notes for Plaintiff stating she should remain off work entirely until she had surgery. (R. 526; 528-29; 533; 542).

In March 2010, relying on Plaintiff's February 2010 discogram results, Dr. Hennessy recommended spinal fusion at L3-4 and L4-5, and requested an updated MRI of the lumbar spine to confirm whether L5-S1 should also be included in the fusion. (R. 554-88). Dr. Hennessy also evaluated an opinion by Dr. Edward J. Goldberg, an orthopedic surgeon who examined Plaintiff for worker's compensation purposes in December 2009. (R. 551-53). Dr. Goldberg opined that Plaintiff required no further treatment, diagnostic testing, or surgery, stated she could be magnifying her symptoms, and determined that she should be released to full-duty work, without restrictions. (*Id.*).

---

4       "Ultram" is a brand name for "tramadol," which is "an opioid analgesic used as the hydrochloride salt for the treatment of pain following surgical procedures and oral surgery." http://www.rxlist.com/ultram-drug.htm; http://medical-dictionary.thefreedictionary.com/tramadol.

5       "Flexeril" is a brand name for "cyclobenzaprine," which is "a skeletal muscle relaxant." http://www.rxlist.com/flexeril-drug.htm; http://medical-dictionary.thefreedictionary.com/cyclobenzaprine.

Dr. Hennessy wrote a March 24, 2010 rebuttal letter stating Dr. Goldberg's opinion was unreliable because he did not review Dr. Hennessy's records or Plaintiff's discogram results. (R. 564). Later, in October 2010, Plaintiff complained of increased pain, and stated she was taking 8 or 9 Vicodin a day to control the pain. (R. 574). Dr. Hennessy told Plaintiff she must limit her use to 4 Vicodin a day, or she risked liver damage. (*Id.*).

In December 2010, while awaiting approval for the lumbar spine MRI and surgery from Plaintiff's insurer, she complained to Dr. Hennessy of cervical spine pain with radicular symptoms. (R. 576-77). Relying on a new cervical spine MRI and his examination results, Dr. Hennessy found only minor issues and no loss of disc height or neurological impingement in her cervical spine. (R. 580-81). He recommended a cervical epidural for Plaintiff's pain and a follow-up in six weeks. (*Id.*).

Finally, the record contains a February 7, 2011 letter by Dr. Hennessy providing a detailed summary of his treatment of Plaintiff and his opinions regarding her condition, written at the request of her SSI/DBI attorney. (R. 583-90). The letter also contained some additional information and clarification of Dr. Hennessy's notes. (*Id.*). This new information and clarification included that Dr. Hennessy had also reviewed and relied on a February 2009 NCS/EMG study performed on Plaintiff that revealed acute left L-5 radiculopathy in her lumbar spine; that he thought Plaintiff's January and April 2009 injuries aggravated her pre-existing degenerative disk disease and stenosis of the lumbar spine; and that Plaintiff's recent complaints of cervical spine pain and radiculopathy were new and unrelated to her 2009 injuries. (*Id.*). The surgeon also gave some additional criticisms of Dr. Goldberg's opinion, including that he did not think Dr. Goldberg properly assessed Plaintiff's radiculopathy. (*Id.*). In conclusion, the letter

confirmed that Plaintiff had not yet had surgery or another lumbar spine MRI, but Dr. Hennessy still recommended both. (*Id.*).

The ALJ provided a detailed summary of Dr. Hennessy's notes, examination results, and recommendations through December 2010 in her decision, but did not discuss the February 7, 2011 letter. (R. 29-30). The ALJ concluded that "Dr. Hennessy's opinion" was entitled to "some weight since he is [Plaintiff's] treating doctor," but the opinion was not entitled to controlling weight because the surgeon's "own testing results do not indicate the claimant is more restricted" than the AJL's RFC determination. (R. 29-30). The ALJ's statement implies that she discounted the weight of Dr. Hennessy's opinion because his examination results were mostly positive and did not support the limitations the surgeon imposed on Plaintiff's ability to work. And, the ALJ's summary contains several of Dr. Hennessy's positive examination results made over time that support that conclusion. (*Id.*).

Unfortunately, as Plaintiff argues, the ALJ failed to discuss several other pieces of important information, including diagnostic testing results and other medical evidence, that supported Dr. Hennessy's opinions and undermined the ALJ's conclusions. "Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). For example, the ALJ did not discuss Plaintiff's February 2010 discogram results that Dr. Hennessy used in forming his opinions. The ALJ noted that Dr. Hennessy recommended a discogram, and that another physician, Dr. Frank, an orthopedic surgeon, agreed with

Dr. Hennessy's recommendation. (R. 29). That discogram produced positive results for "tremendous" and "severe" pain and other abnormal results in Plaintiff at L3-4, L4-5, and L5-S1, but no pain or abnormal results at L2-3. (R. 554-55). Dr. Hennessy explained in his March 2010 notes, and more particularly in his February 7, 2011 letter, that he used the discogram to confirm and refine his opinions regarding the severity of Plaintiff's condition and the need for surgery. (R. 556-57; 583-90). As Plaintiff points out, neither the discogram results themselves, nor Dr. Hennessy's statements about those results in his notes or his February 2011 letter, were discussed or analyzed by the ALJ.

The ALJ also briefly mentioned that Plaintiff had a NCS/EMG study in February 2009 that showed evidence of acute left L5 radiculopathy, but does not discuss Dr. Hennessy's reliance on the NCS/EMG study results. (R. 29). The surgeon found that these results were consistent with Plaintiff's symptoms, and noted that the lumbar epidurals recommended to Plaintiff as a result of the NCS/EMG study only worked "a little," according to her. (R. 330-31; 583-85). Some of Dr. Hennessy's analysis on this issue was only explained in the February 2011 letter that, as stated above, the ALJ failed to discuss.

The Commissioner notes that the ALJ discussed other evidence in the record that supported the disability determination, including certain MRI results, and Dr. Hennessy's positive examination results. (Doc. 33, at 4-5). The Commissioner does not address the lack of analysis regarding the NCS/EMG results or the discogram results, but does argue, in regards to the February 2011 letter, that it added little to the record.[6] (*Id.* at 6). The Commissioner then relies on the familiar principle that an ALJ is

_____

6       The Commissioner specifically argues that Dr. Hennessy's February 7, 2011 letter contained no "opin[ion] on any specific work-related limitations" for Plaintiff. (Doc. 33, at

"not required to discuss every piece of evidence but is instead required to build a logical bridge from the evidence to her conclusions." (*Id.* (quoting *Simila*, 573 F.3d at 516)). Unlike in *Simila*, this is not a case where mere "snippets" of notes or testimony were not discussed by the ALJ. 573 F.3d at 516. Rather, as Plaintiff argues, the ALJ here failed to discuss, and therefore potentially ignored, medical evidence that arguably supported Dr. Hennessy's opinions, was expressly relied on by him, and potentially undermined the ALJ's conclusions. And, certain information in Dr. Hennessy's February 2011 letter, contrary to the Commissioner's arguments, clarified the surgeon's opinions, and was not considered by the ALJ. As a result, on remand, the ALJ should revisit the explanation for the weight given to Dr. Hennessy's opinion, and should particularly address the items described above.

In addition to discussing the medical evidence the ALJ ignored, the ALJ should more specifically articulate the weight given to Dr. Hennessy's opinions and "the reasons for that weight." *Collins*, 324 F. App'x. at 520. The ALJ wrote that she gave some, but not controlling, weight to "Dr. Hennessy's opinion." (R. 30). This suggests that Dr. Hennessy had one, consistent opinion, but the surgeon actually gave multiple opinions regarding Plaintiff's limitations. Dr. Hennessy's opinions significantly changed over time, and the conclusory analysis provided by the ALJ makes it impossible to determine which of his opinions were credited, and why. On remand, the ALJ should take the opportunity to add more clarity and specificity regarding her determinations concerning Dr. Hennessy's opinions.

---

6). This is incorrect; the letter discussed the surgeon's various recommendations that Plaintiff not be required to lift more than 10 pounds, that she not be required to work more than four hours a day of seated work, and that she not be required to work at all, pending surgery. (R. 583-90).

### 2.    Dr. Goldberg

Plaintiff also argues that the ALJ erred by attributing "considerable weight" to the December 2, 2009 opinion of Dr. Goldberg, an orthopedic surgeon who examined Plaintiff once in relation to her worker's compensation claim.  (Doc. 18, at 13-14).  The ALJ was not required to give Dr. Goldberg's opinion any particular weight since that doctor has no ongoing treatment relationship with the Plaintiff.  *Warren v. Colvin*, —F. App'x.—, 2014 WL 3409697, at *4 (7th Cir. 2014) (citing 20 C.F.R. § 404.1502; *Simila*, 573 F.3d at 514; *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005)).  Instead, an ALJ shall determine the weight a non-treating source's opinion deserves by examining how well the source supported and explained his opinion, whether his opinion is consistent with the record, and "any other factor of which the ALJ is aware." *Simila v. Astrue*, 573 F.3d 503, 514-15 (7th Cir. 2009).

As stated above, Dr. Goldberg examined Plaintiff for worker's compensation purposes in December 2009.  (R. 551-53).  The doctor also analyzed Plaintiff's medical records from 2008 through May 2009, including her MRI and NCS/EMG results from early 2009, but did not review records from Dr. Hennessy's treatment that began in July 2009.  (*Id.*).  Dr. Goldberg wrote a report detailing his examination results and analysis, dated December 2, 2009.  (*Id.*).  Among other issues, the doctor noted Plaintiff's January 2009 lumbar spine MRI revealed "slight disc degeneration" at L4-5 and a left-sided disc herniation at L1-2.  (*Id.*).  Dr. Goldberg also noted Plaintiff had been diagnosed with acute left L5 radiculopathy based on the NCS/EMG results.  (*Id.*).  The doctor concluded, based on his examination and analysis, that Plaintiff did not require

surgery or any other treatment, and should be released to full-duty work, without restrictions. (*Id.*).

The ALJ gave a detailed summary of Dr. Goldberg's December 2, 2009 report in her decision. (R. 31). She thoroughly discussed the doctor's examination results in particular, including that he found Plaintiff's flexion, extension and rotation of the cervical spine were normal, and Plaintiff was able to flex her thoracolumbar spine to 70 degrees and bend and extend it to 30 degrees. (*Id.*). The ALJ also noted that Plaintiff did not complain of pain upon palpation in the lumbar spine during Dr. Goldberg's range of motion testing, but did complain of some loss of sensation and some other tenderness to palpation. (*Id.*). The ALJ specifically noted that Dr. Goldberg explained that Plaintiff's subjective complaints could not be substantiated based on her physical examination or her lumbar spine MRI results. (*Id.*). The ALJ also noted the doctor's statements in his report that he was concerned Plaintiff was magnifying her symptoms, and that she did not need surgery or other treatments. (*Id.*). The ALJ explained that she found Dr. Goldberg's opinion was supported by his examination findings. (*Id.*).

The ALJ also discussed the consistency of Dr. Goldberg's report as compared to the reports of the state agency consulting physicians in the record. (R. 30). The ALJ explained that a state agency consulting physician, Dr. Barry Free, reviewed Plaintiff's medical records and determined, in a December 1, 2009 report, that she could perform certain sedentary work, with some limitations. (*Id.*). Dr. Free limited Plaintiff to lifting no more than 10 pounds, never climbing ladders, ropes or scaffolds, and only occasionally climbing stairs and ramps. (*Id.*). The ALJ also noted that a second state agency consulting physician, Dr. Reynaldo Guanaco, reviewed the medical evidence of record

upon reconsideration, and confirmed Dr. Free's findings, in a March 8, 2010 report. (R. 30-31; *see also* R. 516-18).

The ALJ specifically discussed that the state agency reviewers assessed records from one of Plaintiff's treating physicians (Dr. Boyd), and a physician who examined her several times for worker's compensation purposes (Dr. Jiang), among other records, in making their assessments. (R. 31). Based on Drs. Boyd's and Jiang's records, the examiners concluded that a 10 pound lifting restriction was necessary for Plaintiff, and both examiners agreed that her pain and restrictions in her range of motion merited the above-discussed restrictions. (R. 518). The record further reveals that the state agency physicians also based their findings in part on Plaintiff's MRIs and x-rays showing mild lumbar arthritis, disc protrusions, stenosis and degenerative disc disease; generally normal examination results, other than some reduced lumbar spine range of motion; and, for Dr. Guanaco, some of Dr. Hennessy's treatment records. (R. 495-502). The ALJ explained that the state agency physicians' opinions were given "significant weight," and that Dr. Goldberg's opinion was "generally consistent" with those opinions. (R. 30). The ALJ then concluded that Dr. Goldberg's opinion also merited "considerable weight" in determining Plaintiff's RFC. (*Id.*). Based on the foregoing, the ALJ sufficiently explained the weight given to Dr. Goldberg's opinion by analyzing its supportability and consistency with the evidence, as the regulations require. *See* 20 C.F.R. § 404.1527(c).

Plaintiff argues that the ALJ's explanation for the weight accorded to Dr. Goldberg's opinion was insufficient. (Doc. 18, at 13-14; Doc. 34, at 2-3). She argues that the ALJ should have more specifically stated what was "generally consistent" between Dr. Goldberg's opinion and the state agency physicians' opinions, and should

have expressly discussed that Dr. Goldberg only examined her once. (*Id.*). Plaintiff argues this additional information is necessary for the ALJ to "build a logical bridge" between the evidence and her conclusions. (*Id.*).

However, as the Commissioner points out, the Court's job is not to nitpick the ALJ's decision, but rather to determine whether it is supported by substantial evidence, and whether the ALJ has minimally articulated her reasons for the weight given to a physician's opinion. *See Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (courts reviewing an ALJ's decision in weighing a medical opinion employ a "very deferential standard"). Plaintiff does not challenge the ALJ's reasonable reliance upon or analysis of the state agency physicians' opinions. And, the ALJ's decision shows she compared the similar assessments of Drs. Free, and Guanaco with Dr. Goldberg, and determined the opinions should be accorded similar weight. This reasoning is logical and supported by the record. The ALJ's summary of Dr. Goldberg's report also shows that she understood Dr. Goldberg only performed one "independent medical examination" of Plaintiff, even though the ALJ did not expressly discuss the effect the lack of a treatment relationship had on the weight she assigned that doctor's opinion. (R. 31). An ALJ need not expressly discuss her findings on each of the factors in the regulations for weighing medical opinions, so long as her decision shows that she did consider them, as was sufficiently shown here. *See Sawyer v. Colvin,* 512 F. App'x 603, 609 (7th Cir. 2013) (the ALJ must consider certain factors in evaluating medical opinions as set forth in the regulations, but need not "lay out these factors one by one" in her analysis).

Plaintiff also argues that the ALJ should have expressly considered the medical evidence that was ignored in analyzing Dr. Hennessy's opinions when analyzing Dr.

Goldberg's opinion. (Doc. 18, at 13-14; Doc. 34, at 3). In particular, Plaintiff points out that Dr. Hennessy's February 7, 2011 letter purports to describe reasons that Dr. Goldberg's opinion is unreliable, including because Dr. Goldberg did not have Plaintiff's discogram results and because he allegedly gave short shrift to the evidence of her radiculopathy.[7] Since the ALJ has been directed to consider Dr. Hennessy's letter above in the context of analyzing Dr. Hennessy's opinion, the ALJ should also discuss the effect, if any, that the letter has on her analysis of Dr. Goldberg's opinion.

## E.    Credibility Determination

Finally, Plaintiff argues that the ALJ erred in finding Plaintiff not credible. (Doc. 18, at 14-15). In assessing a claimant's credibility, the ALJ is required to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). *See also* 20 C.F.R. § 404.1529(c). The ALJ's credibility determination must "contain specific reasons for the finding on credibility, supported by the evidence in the case record." *Schreiber v. Colvin*, 519 F. App'x 951, 960 (7th Cir. 2013) (quoting SSR 96–7p, 1996 WL 374186, at *4). Nevertheless, "[b]ecause hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, [courts] afford their credibility determinations

---

7    Plaintiff further argues that the ALJ should have considered that she had a December 2010 cervical spine MRI conducted after Dr. Goldberg rendered his opinion. (Doc. 18, at 3). But rather than overlooking this evidence, the ALJ discussed this MRI and its "mild" and "minimal" results in her opinion. (R. 30). Plaintiff fails to explain how anything about those results undermines Dr. Goldberg's opinion or the ALJ's assessment of that opinion. Thus, the ALJ's discussion of these MRI results was sufficient.

special deference." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (citing *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997)). Therefore, an ALJ's credibility determination will be overturned only if "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008); *Schreiber v. Colvin*, 519 F. App'x 951, 960 (7th Cir. 2013).

The ALJ discussed Plaintiff's hearing testimony, statements to physicians, and her function reports, in detail. The ALJ noted Plaintiff testified that she was experiencing weaknesses in her legs and back pain that prevented her from working. (R. 27). Plaintiff further testified that her back pain prevented her from doing housework, such as sweeping and mopping, because she could not twist her body, and her husband and son must help her with the housework. (*Id.*). She also alleged that her pain prevents her from concentrating, affects her sleep and memory, and reported in a function report that, she "really . . . can't do nothing." (R. 27-28).

The ALJ explained that she did not find Plaintiff's testimony fully credible for several reasons. Plaintiff received unemployment benefits after her alleged disability onset date, which required her to affirm that she was capable of working. (R. 28). The ALJ found the fact that Plaintiff inconsistently alleged being able to work with one government agency, but unable to work with another, negatively affected the reliability of her allegations. (*Id.*) The ALJ also noted that Dr. Goldberg suggested Plaintiff exaggerated her symptoms and limitations, which supported finding that she may have "consciously attempted to portray limitations tha[t] are not actually present in order to increase the chance of obtaining benefits." (*Id.*). The ALJ found that Plaintiff was "inconsistent and evasive" during the hearing testimony as well. For example, Plaintiff testified that she drove herself once or twice a week for shopping, going to the mall, or

to attend ESL classes, yet reported elsewhere that she could not drive at all. (*Id.*). The ALJ stated that even if Plaintiff was not "conscious[ly]" intending to mislead anyone, her inconsistency still made her allegations generally unreliable. (*Id.*).

The ALJ also noted that there was evidence in the record suggesting Plaintiff might be motivated not only by her alleged disability, but also by discrimination-related factors, to seek disability benefits. (R. 28). Plaintiff testified that she worked as a greeter at Wal-Mart as a potential accommodation for her work restrictions, but also testified that her supervisor was discriminating against her and did not let her continue working in that position. (*Id.*). The ALJ thought this suggested that Plaintiff ceased working at Wal-Mart in the greeter position for discrimination-related, rather than medically-related, reasons. (*Id.*). In support, the ALJ also cited a charge of discrimination that the Plaintiff filed with the Illinois Department of Human Rights, wherein Plaintiff claims that she requested an accommodation for a disability that was denied, and that she was eventually indefinitely suspended from work, for discrimination-related reasons. (*Id.*; *see also* R. 220). The ALJ concluded that had Plaintiff's employer put her in a position that accommodated her limitations, Plaintiff might have continued working rather than applied for disability-related benefits. (R. 28-29). And, as discussed above, the ALJ also found the medical and opinion evidence did not support Plaintiff's subjective complaints. (R. 29-31). The ALJ gave specific reasons for discounting Plaintiff's credibility, and her reasons are supported by the record.

Plaintiff raises several alleged flaws in the ALJ's credibility finding that she argues require reversal. (Doc. 18, at 14-15; Doc. 34, at 4-7). First, Plaintiff argues that the ALJ could not rely on Dr. Goldberg's statement that he was "worried about symptom

magnification." (*Id.*). She asserts that Dr. Goldberg's statement that he was "worried about symptom magnification" is not an objective finding that the ALJ can rely upon. (*Id.*). She also criticizes Dr. Goldberg's opinion as unreliable because he did not review medical evidence in the record developed after his examination, and because she disagrees with the determination the doctor came to regarding the evidence he did review. (*Id.*). Dr. Goldberg, however, evaluated Plaintiff's then-existing symptomology based on his contemporaneous examination of Plaintiff and review of her recent medical records, including her prior MRIs and NCS/EMG results. (R. 551-53). The doctor cannot be faulted for failing to consider evidence developed after he examined Plaintiff, when opining on her tendency to over-state her limitations as they existed at the time he evaluated her. Although Plaintiff may disagree with the ALJ and Dr. Goldberg, an ALJ may nevertheless rely on a physician's "belief that [a claimant] may be exaggerating his symptoms" to discount the claimant's credibility, as the ALJ did here. *Adkins v. Astrue*, 226 F. App'x 600, 606 (7th Cir. 2007).

Second, Plaintiff argues that the ALJ's statement that one of her physicians released her to work, with some restrictions, is too vague, because the ALJ did not name the physician or cite the report she was relying upon. (Doc. 18, at 15; Doc. 34, at 5-6). The Commissioner suggests that the ALJ could have been referring to Dr. Jiang's report, but that is incorrect, because Dr. Jiang released Plaintiff for work without any restrictions. (R. 438). Instead, based on the ALJ's summary, it is clear that this was a reference to Dr. Hennessy's notes. As the ALJ's decision reflects, Dr. Hennessy recommended that Plaintiff could work, with certain restrictions, but Plaintiff later reported to this physician that her employer would not comply with those restrictions.

(R. 28-29; *see also* R. 330-35). Although a citation to the record would have been helpful, the ALJ was specific enough in her summary of Dr. Hennessy's statements that this Court was able to identify both the physician and his relevant notes, and the ALJ's discussion of that evidence was accurate.

Finally, Plaintiff argues that the ALJ erred in using the fact that she collected unemployment benefits to discount her credibility. (Doc. 18, at 14; Doc. 34, at 4-5). "[I]t is appropriate for the ALJ to consider any representations [a claimant] has made to state authorities and prospective employers that he can work." *Knox v. Astrue*, 327 F. App'x 652, 656 (7th Cir. 2009) (citing *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005)). A claimant might still be disabled even though he seeks employment, certifies that he is capable of working, or even actually works beyond his limitations, out of desperate financial need. *Richards v. Astrue*, 370 F. App'x 727, 732 (7th Cir. 2010) (citing *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003)). But even if a claimant stated to state authorities or prospective employers that he could work when he could not, the ALJ could still rely on that false statement as a factor adversely impacting a claimant's credibility. *Lott v. Colvin*, 541 F. App'x 702, 707 (7th Cir. 2013).

Plaintiff admits that she did not explain at the hearing the apparent inconsistency between her certifying she could work when seeking unemployment benefits, while simultaneously alleging that she could not work to the SSA. (Doc. 34, at 4-5). She argues that no reason was given at the hearing because her attorney (and the ALJ) was confused and thought she was collecting worker's compensation benefits, not unemployment benefits. (*Id.*). Now, she suggests that, had she been asked about the

issue during the hearing, she might have testified that she only certified she could work part-time to the unemployment authorities. (Doc. 18, at 14; Doc. 34, at 4). She argues that this would have made her eligible for unemployment benefits while leaving her eligible for SSI/DIB benefits, without there being any inconsistency or false statements on her part. (*Id.*).

The inconsistency noted by the ALJ was just one of many factors that she relied on to find Plaintiff was not fully credible, and the determination is not "patently wrong" because Plaintiff suggests hypothetical testimony that might impact one aspect of the ALJ's otherwise-sound credibility analysis. Nevertheless, if the ALJ chooses, on remand, to rely on Plaintiff's ability-to-work certification to the unemployment authorities as a factor in evaluating her credibility, the ALJ should question Plaintiff on this issue and consider whatever testimony the Plaintiff provides on this topic.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment is granted, and Defendant's Motion for Summary Judgment is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: July 23, 2014

SHEILA FINNEGAN
United States Magistrate Judge